UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
_____

UNITED STATES OF AMERICA

          **No. 2:11-CR-133**

   **v.**

          **MEMORANDUM OF LAW/BRIEF**

**MOHAMED ALESSA,**

          **18 USC 3582(c)(1)(A)(i)**

          Defendant.
_____

**DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE
BASED ON EXTRAORDINARY AND COMPELLING REASONS**

Mohamed Alessa, by undersigned counsel, moves this Court on July 15, 2024, pursuant to 18 U.S.C. § 3582(c)(1)(A), for a modification of his sentence based on extraordinary and compelling reasons, which include his parents' need for him to care for them, and the disparity between his sentence and many more recent material support sentences, as well as the role the terrorism sentencing enhancement played in this case. Mr. Alessa was sentenced to 264 months in April, 2013, and has now served nearly 75% of his sentence.

**Jurisdiction and Authority to Act**

Mr. Alessa is presently incarcerated, under BOP Register Number 61801-050, at USP Marion. He submitted a request for compassionate release to the warden and it was denied on May 30, 2023. (Exhibit "A") Therefore, Mr. Alessa has exhausted his administrative remedies under 18 USC 3582(c)(1)(A). *United States v. Hammond*, 2020 US Dist. LEXIS 67331 (DDC 2020.)

On November 1, 2023, the United States Sentencing Commission's updated Guidelines went into effect. Section 3582(c)(1)(A) authorizes a court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons" warrant a reduction and "such a

1

reduction is consistent with applicable policy statements issued by the Sentencing Commission."

The Sentencing Commission stated:

> "In 2018, the First Step Act put an end BOP's gatekeeping function and allowed individuals to file motions for sentence reductions under the statute. Because the Commission lost its quorum in early 2019 and did not regain it until 2022, it was unable to amend §1B1.13 during the more than four-year period since defendants were first permitted to file such motions. During those years, courts have found extraordinary and compelling reasons warranting sentence reductions based on all of the factors the Commission identified in First Step Act—Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) 2 | April 27, 2023 2007, i.e., the three specified bases of medical condition, age, and family circumstances, and the "other reasons" catchall. Commission data indicate *courts have hewed to the "extraordinary and compelling" requirement*, see U.S. SENT'G COMM'N, COMPASSIONATE RELEASE DATA REPORT (Dec. 2022), at tbls. 10, 12, & 14, and while they have found such circumstances to be present in more cases than BOP had before the First Step Act, *they have been judicious in granting relief*.
>
> Among other things, the amendment extends the applicability of the policy statement to defendant-filed motions; *expands the list of specified extraordinary and compelling reasons that can warrant sentence reductions; retains the existing "other reasons" catchall; provides specific guidance with regard to the permissible consideration of changes in the law; and responds to case law that developed after the enactment of the First Step Act.* The amendment is informed by Commission data, including its analysis of the factors identified by courts in granting sentence reduction motions in the years since the First Step Act was signed into law. It is also informed by extensive public comment, including from the Department of Justice, the Federal Public and Community Defenders, the Commission's advisory groups, law professors, currently and formerly incarcerated individuals, and other stakeholders in the federal criminal justice system." https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf at 1-2, emphasis supplied

**Family Circumstances**

One of the revisions the Sentencing Commission recently made was to expand the

"Family Circumstances" ground for a sentence reduction. In explanation the Commission stated:

> "…[T]he amendment adds a new provision for cases *in which a defendant's parent is incapacitated and the defendant would be the only available caregiver*. Other than the relationships specified in the current policy statement, a parent has been the family member most often identified as needing care by courts granting sentence reductions under § 3582(c)(1)(A). See U.S. SENT'G COMM'N, COMPASSIONATE RELEASE: THE IMPACT OF THE FIRST STEP ACT AND COVID-19 PANDEMIC (2022), at 32; see also United States v. Bucci, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (concluding that there is "no reason to discount" a defendant's caregiving First Step Act—Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) 4 April 27,

2023 role "simply because the incapacitated family member is a parent and not a spouse," registered partner, or minor child)."
https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf   at 3-4

Mohamed Alessa is an only child, and his parents are both ill and need him to support and help care for them. There is no one else who can do that. His father, Mahmoud Hijjawi, is 75 years old suffers from stage 3 kidney disease, hypertension, and other medical conditions, and was forced to retire as a result in 2016. (See letter from Dr. Sam Hajal, and Declaration, attached as Exhibit "B" at 1)

Mr. Alessa's mother, Nadia Abusoud, 63, has endometrial cancer and underwent surgery in 2021. (See letter from Dr. Mira Hellmann, attached as Exhibit "B" at 2) She is lucky that the surgery seemed to be successful, but she must go regularly for post-surgery check-ups, as noted in the doctor's letter. In addition, while she is currently still able to work, it is not easy for her. She used to work part time, but is now forced to work full-time, making about $500/week, which, with Mahmoud' meager social security, is just barely enough to cover their $1700 rent and other expenses. She said:

> "I used to work part-time but had to go full-time since my husband couldn't work anymore. It is extremely difficult to work full-time and also manage all of our medical appointments and everything else. I need my son Mohamed to be released so he can help with all the appointments and also help contribute financially. Otherwise I don't know what we will do since I don't know how much longer I can manage like this. We have no other children and no one else to help." (Declaration of Nadia Abusoud, attached as Exhibit "B" at 3.)

In his Declaration, Mohamed Alessa stated:

> "…[M]y parents need me to help take care for them and provide for them as they are getting older and sicker. My greatest fear is that one or both of them will pass away while I am still in prison. I am their only child and I am full of shame about how I have disappointed and hurt them. I want and need to make it up to them." (Exhibit "B" at 4)

**The Underlying Case**

In June, 2010, Mohamed Alessa and co-defendant Carlos Almonte were arrested and charged, in a sting operation, with attempting to fly to Egypt with plans to then head to Somalia and join Al Shabab. They were charged with Conspiracy to Injure Property of a Foreign Government under 18 USC 956(a)(1). In March, 2012, Mr. Alessa pled guilty to this same charge. In April, 2013, he was sentenced to 264 months imprisonment. (Mr. Almonte, who also pled guilty, was sentenced to 240 months.)

Mohamed Alessa, who no longer supports Al Shabab (and hasn't for many years) has apologized for his statements and actions in this case, noting that he was immature and dealing with a lot of anger issues and mental health challenges at the time. (Exhibit "B" at 4) (He also apologized to the Court at the time of sentencing back in 2013.)  Mr. Alessa has now served nearly fourteen years of his twenty-two year sentence, and is due to be released in May, 2029, meaning that *he has served about 75% of his sentence at this point*.

A major contributing factor to the offense was Mr. Alessa's long-standing mental health issues, which often manifested in his acting out in various ways. At sentencing, the Court stated:

> "The evidence shows that *Alessa suffers from serious psychological impairment from early childhood* resulting [in] continual hostile anti-social behavior. And in later years, it took the form of adoption of extreme Muslim religion, Jihadism, which called for the death of those who disagreed with him…
> The Government psychiatrist and psychologist expressed the opinion that Alessa's anti-social personality traits are, in effect, permanent. And the Government cited an episode of prison violence as evidence… *The psychiatric evidence of any untreatable condition was effectively countered by Mr. Alessa and Mr. Almonte's expert*, and irrefutable experts established that prior episode was not the result of defendant's aggressiveness, but rather they justifiably were defending themselves against a dangerous inmate with a weapon." (Sentencing Transcript, at 133-134, emphasis supplied)

Defense counsel noted that there were four different forensic mental health experts who prepared reports in this case, two for the defense and two for the government. (Sentencing

Transcript, at 9) They all agreed that there were long-standing serious mental health challenges. The difference between the defense and prosecution experts, as the Court noted, was that the prosecution experts tended to believe that Mr. Alessa would *always* be prone to violent outbursts – that his condition was somehow untreatable. However, as discussed below, it can now be seen that, while Mr. Alessa still struggles with regulating his emotions to some extent, *his condition has improved greatly over the years as he matured, and he has shown that he can refrain from any violent outbursts.*

**The Undercover Agent and His Influence on Mr. Alessa**

While Mohamed Alessa had previously expressed some interest in jihadist ideas, and had traveled to Jordan (where he had family) as a teenager in 2007, in part to explore those possibilities - but also to attend school - he was essentially kicked out of Jordan due to provocative statements he was making, and returned home. (Sentencing Transcript, at 12-15) (It is noted that when his uncle offered to drive him to the Iraqi border so he could try to join an insurgent group, he declined. [Sentencing Transcript, at 15-16]) After he, then 18, was interviewed by authorities at JFK Airport and subsequently subpoenaed to testify at a Grand Jury, the FBI began the instant sting operation. (Sent. TR, at 19)

Soon after that Mr. Alessa met "Bassem," an undercover agent who was a few years older than him, and befriended him, encouraging his jihadist ideas, and trying to get him to take some action. (Sentencing Transcript, at 21, 23-24) Dr. Abudabbeh (one of the forensic experts) noted that Mr. Alessa was vulnerable to suggestion, and that the relationship with Bassem was asymmetrical, as Bassem was older, gave him gifts, and Mr. Alessa wanted to please him. (Sent. TR, at 10-11, 29-30)

Bassem (who also tried unsuccessfully to get Mr. Alessa interested in doing an attack in the United States) was upset that Mr. Alessa was still sometimes interested in going to Sweden, apparently to meet a girl, instead of Somalia. (Sent. TR, at 23, 26) Bassem also kept pushing Mr. Alessa to renew his passport for several months, before he finally did, and also to buy plane tickets to Egypt. (Sent. TR, at 24-25) Mr. Alessa also refused Bassem's suggestion that he get armed training in Mogadishu. (Sent. TR at 26)

There were other indications that Mr. Alessa, who was said to have poor reality testing, was not looking at the situation realistically, and that his focus was only *sometimes* on joining Al Shabab. For instance, he really wanted to bring his cat on the plane with him, and was devasted when he learned he could not do so, deciding instead to get a cat once in Egypt. (Sent. TR, at 28)

Although it was not clear whether he would have actually ended up in Somalia if not stopped at the airport, or whether he would have then sought out Al Shabab; and while it appears very likely that this would *not* have occurred were it not for the manipulation by Bassem, Mohamed Alessa does realize that, by planning and taking steps to do so, he committed a very serious crime. He has now served nearly three quarters of his 22 year sentence, and is older and wiser, with much improved mental health. Mr. Alessa is committed to a law-abiding existence assisting his parents upon release.

### Sentencing Parameters and Terrorism Enhancement

Mohamed Alessa's base offense level was 33, and with 3 points off for acceptance of responsibility and a timely plea, his adjusted offense level would have been 29. (Plea Agreement, at 7) Upon information and belief, his criminal history level would have been I, yielding a sentencing range of 97-121 months, significantly less than the 168 months he has already served, not even taking into account the good time he earned.

6

But the Terrorism Enhancement under USSG 3A1.4. resulted in an increase of 12 levels, and a criminal history category of VI, resulting in a Guidelines sentencing range of 360 months to life. As discussed more below, while under the law this enhancement does technically apply herein, the enhancement is not empirically based, and its application skews the entire sentencing process in an unfair way, ratcheting up sentences very drastically.

It is also true that, based in part on the understanding that the Terrorism Enhancement would apply, but was perhaps too severe, both parties agreed that the sentence herein would be between 15 and 30 years, substantially longer than the 97-121 months which would have applied without the enhancement. (Plea Agreement, at 8) While the Court's 22 year sentence was right in the middle of that 15 – 30 year range, and constituted a variance from the Guidelines range, it is submitted that it was still unfairly skewed upward by the problematic effect of the Terrorism Enhancement.

**Mr. Alessa's Institutional Record**

Mohamed Alessa has done much better in prison over the years, as he matured and learned to deal with his mental health challenges. Very significantly, *he has an extremely minimal risk score on his Pattern Risk Assessment completed in January, 2024*. (Exhibit "C" at 1) His general score is -9 and his Violent Score is -3. (Exhibit "C" at 1) Minimum security is considered 8 general points or less, and 6 violent points or less. (See Male PATTERN Risk Scoring Form, attached as Exhibit "C" at 23) A below zero score such as Mr. Alessa's is exemplary.

Mr. Alessa also recently completed a 10 week workshop on Traumatic Stress and Resilience Resolve (TSR) in April, 2024. (Exhibit "C" at 3-4) The provider, Dr. Marissa McKee phD/ACL TS noted that there was *no need for further treatment*, stating:

"Mr. Alessa completed the required testing at the end of TSR. Results indicate that he does not have a need for the Brief Clinical Interview or further treatment at this time…." (Exhibit "C" at 3)

He also completed an anger management class in November, 2023, and both that and the Trauma Workshop have been helpful to him. (Exhibit "C" at 5-6)

Mr. Alessa's disciplinary history has improved greatly. It shows that he had several violations every year between 2011-2015, and far fewer after that. (Exhibit "C" at 15-22 He has had no disciplinary violations since November, 2022, over a year and a half ago, and intends to keep it that way. His most recent violations were all minor[1], and involved things like making insolent comments, and once refusing a work assignment. (Exhibit "C" at 15)

Mr. Alessa was, at least since January, 2023, determined to be "Care 1" status for mental health, meaning a lack of serious issues. (Exhibit "C" at 7) He was said not to have any unfulfilled mental health needs as of that time, though it was noted that he needed to address his anger, and had trauma and cognition issues. (Exhibit "C" at 7) Since then, as noted, he successfully completed the trauma workshop and anger management course. (Exhibit "C" at 3-6)

Mohamed Alessa has completed more than 30 programs over the years, despite the relative paucity of programs available in a CMU. (Exhibit "C" at 7) He was scored at the Low security level in 2023 on his Male Custody Classification Form. (Exhibit "C" a14 2)

In sum, while Mohamed Alessa has still struggled with his underlying issues to some extent, he has done much better over the years, has shown he can avoid any violent outbursts, has an extremely minimal PATTERN score, and should not be considered to pose any risk to the

---

[1] The most recent violation which was considered serious (a 200-level charge, 297 in this case) occurred in September, 2020, and it is submitted that it should not have been considered serious because all that happened was that his mother put his aunt on the phone so she could speak to him, even though this was not permitted as he was in a Communication Management Unit (CMU) where phone contacts were very limited. Prior to that there were no serious violations in a decade. (Exhibit "C" at 8-10)

public. And upon release, the Probation Department will almost certainly order a mental health

assessment to see if he has treatment needs going forward.

## POINT I

### THERE ARE EXTRAORDINARY AND COMPELLING REASONS TO REDUCE THE SENTENCE TO TIME SERVED, MOST SIGNIFICANTLY THE SITUATION OF MR. ALESSA'S PARENTS

### A.  Family Circumstances

USSG 1B1.3(b)(3)(C) now provides:

"Extraordinary and compelling reasons exist under any of the following circumstances or
a combination thereof:
     ***
(**3**) Family circumstances of the defendant.
***
(**C**) The incapacitation of the defendant's parent when the defendant would be the only
available caregiver for the parent.

There are many recent cases where a sentence reduction has been granted based on the

need for the defendant to care for a family member (almost always a parent), either standing

alone, or combined with other extraordinary and compelling reasons. *United States v. Hunaity*,

2024 US Dist. LEXIS 39940 (DNJ 2024); *United States v. Walker*, 2024 US Dist. LEXIS 25188

(DNJ 2024); *United States v. Gore*, 2021 US Dist. LEXIS 23304 (DNJ 2021); *United States v.*

*Mendoza*, 2022 US Dist. LEXIS 91239 (NDCA 2022); *United States v. Daham*, 2021 US Dist.

LEXIS 15378 (DME 2021); *United States v. Wooten*, 2020 US Dist. LEXIS 191940 (DCT

2020); *United States v. Dublin*, 2020 US Dist. LEXIS 151443 (DRI 2020); *United States v.*

*Stokes*, 2024 US Dist. LEXIS 9845 (DCT 2024); *United States v. Movahed*, 2024 US Dist.

LEXIS 23283 (DUT 2024); *United States v. Vanlaar*, 2022 US Dist. LEXIS 111836 (MDNC

2022); *United States v. Washburn*, 2023 US Dist. LEXIS 98732 (DNM 2023) (release granted so

defendant could care for his mother); *United States v. Beebe*, 2023 US Dist. LEXIS 196474

(DAK 2023) (release granted so defendant could care for his father); *United States v. Ziegler*,

2023 US Dist. LEXIS 158094 (DMN 2023) (release granted so defendant could care for his

mother); *United States v. Pickering*, 2021 US Dist. LEXIS 252930 (WDWA 2021) (release

granted so defendant could care for his father); *United States v. Richardson*, 2022 US Dist. LXIS

121910 (NDCA 2022) (release granted so defendant could care for his mother); *United States v.

Wright*, 2022 US Dist. LEXIS 40176 (SDCA 2022) (release granted so defendant could care for

his stepfather); *United States v. Trapps*, 2022 US Dist. LEXIS 201408 (NDCA 2022) (release

granted so defendant could care for his mother); *United States v. Hebel*, 2021 US Dist. LEXIS

245230 (EDMI 2021) (release granted so defendant could care for his mother); *United States v.

Nagi*, 2021 US Dist. LEXIS 212151 (EDMI 2021) (release granted so defendant could care for

his mother); *United States v. Riley*, 2020 US Dist. LEXIS 82909 (DVT 2020); (release granted so

defendant could care for his father); *United States v. Bucci*, 409 F. Supp.3d 1 (DMA 2019)

(release granted so defendant could care for his mother.)

  In several of the cases, the family member wasn't completely incapacitated, or there was

another caregiver who was at least somewhat available. In *Gore*, supra, the NJ court granted

release where the defendant had been incarcerated for 12 years (and still had a few more years to

serve on his 188 month sentence), and was needed to care for his children - their grandmother

was able to do so, but had health problems which had recently prevented her from driving.

  In *Daham*, supra, the defendant's mother was severely obese, and his father had high

blood pressure – neither was able to work. His spouse had back problems and was unable to

properly care for the parents. *It did not appear that either parent was incapacitated, and there

was another caregiver in the household, but the court still granted the motion because, as in the

instant case, it was a very difficult situation.* Similarly, in *Wooten*, supra, the defendant's mother,

69, was still able to care for his disabled sister, but she could no longer drive and the situation was becoming more difficult over time.

In *Dublin*, supra, release was granted so the defendant could care for his children, enabling their mother to work, as it was difficult for her to find daycare. In *Vanlaar*, supra, where the defendant had served about 65% of his sentence, and had five years left to serve, release was granted so that he could reside *near* his elderly mother and also work, sharing the care of his mother with his brother.

In *Ziegler*, supra, the court recently stated:

> "…Mr. Ziegler, along with his co-defendant, used Molotov cocktails to start multiple fires inside the Dakota County Western Service Center…
>    ***
> Mr. Ziegler's mother is diagnosed with stage IV metastatic adenocarcinoma… A nurse practitioner advised the government that Ms. Ziegler is *responding well to her treatments*, however…they are unable to project how long the treatments will remain effective. …Probation observed Ms. Ziegler having difficulty walking for an extended period of time." *Ziegler*, at 2-4, emphasis supplied.

As in *Ziegler*, Mohamed's mother, Nadia, is responding well to her cancer treatments, but due to the unpredictable nature of the disease, it is unclear if it will resurge. While her cancer may not be as severe as that in *Ziegler*, Mohamed's 75 year old father, Mahmoud, has what may be even more serious health problems (progressive kidney disease and other issues), can no longer work, and has many doctors' appointments. As in *Ziegler*, *Draham* and *Wooten,* the situation is becoming more and more difficult over time, and the defendant's presence is needed.

Finally, in *Mendoza*, supra, the court stated:

> "Mendoza seeks compassionate release in order to care for his 80 year old father, who has recently had several strokes and is in poor health. The caregiving for Mendoza's father is currently being *shared* by his 74 year old mother, who *has a number of health issues of her own and who works full-time to provide for the family…and Mendoza's sister*, who is married, cares for two young children, and also works full-time outside the house. … …[N]either relative can quit their job in order to provide the daily care needed by his father. …

The government responds that… defendant's mother and sister are 'capable caregivers.' …The government also asserts that Mendoza is a danger to society. …

The Court concludes that Mendoza has demonstrated extraordinary and compelling reasons warranting compassionate release. It is undisputed that defendant's 80 year old father is in poor and *declining health* and requires considerable caregiving and *transportation to numerous medical appointments*. …Mendoza's mother is… contending with her own health issues… and… must work full-time… Mendoza's sister also works full-time…and at times has been required to take time off of work in order to care for her father. …The Court finds that Mendoza has shown that he is the only available caregiver who can provide the assistance that his father requires." *Mendoza*, at 4-7, emphasis supplied.

As in *Mendoza*, both of Mohamed Alessa's parents have serious health issues, and his mother is forced to work full-time to provide for the family. Unlike, *Mendoza*, there is no other sibling who can help. Based on *Mendoza* and the other cases cited above, this Court should find that Mohamed is needed to help care for his father, bring him to medical appointments, and/or help provide for the family financially.

### B.  OTHER REASONS

#### Lengthy Sentence in Sting Operation with Terrorism Enhancement

The Sentencing Commission's 2023 Guidelines Amendments included a catch-all provision, stating that a sentence may be reduced under 3582(c)(1)(A) "if the defendant presents any other circumstance or a combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)[2]."

Because that provision just went into effect a few months ago, there is not yet a great deal of case law considering what circumstances are "similar in gravity" to those listed. However, in *United States v. Cromitie*, 2024 US Dist. LEXIS 12253 (SDNY 2024) the Southern District recently granted release in a terrorism-related sting case for this reason, based on the unfairness

---

[2] Paragraphs 1-4 provide for reduction based on 1) medical circumstances of the defendant; 2) age/medical decline of the defendant; 3) family circumstances; or 4) that the defendant was the victim of serious abuse by correctional staff.

of the sting operation. (See also *United States v. Williams*, 2023 US Dist. LEXIS 129978 [SDNY 2023][granting release to Mr. Cromitie's co-defendants.) The *Cromitie* sting operation was egregiously unfair because it was clear that the defendants had no interest in terrorism until offered money by the informant, and because the plot set up by the government was manufactured in order to procure a 25 year mandatory minimum sentence.

While this case may not be as unfair as that, as discussed above, there are still several problematic aspects of the sting herein which, in combination with the family circumstances and rehabilitation, warrant a sentence reduction. Those include Mohamed Alessa's serious mental health challenges; the likelihood that, while he made provocative statements, he would not have been willing or able to take any action were it not for the prodding and assistance of the older undercover agent who befriended him; and the huge increase in the guidelines range due to the terrorism enhancement.

In *Cromitie*, the court recently stated:

"In October, 2010, James Cromitie [and three codefendants]… was convicted of conspiracy to use weapons of mass destruction, conspiracy to acquire and use anti-aircraft missiles, conspiracy to kill officers and employees of the United States… all in connection with their participation in an FBI-orchestrated conspiracy to 'bomb' a Jewish community center…and to 'destroy military aircraft'… …Cromitie and his codefendants were sentenced in 2011 to a mandatory minimum term of 25 years…
    ***
On November 1, 2023, the Sentencing Commission amended the Guidelines so that it now provides guidance for courts in deciding petitions initiated by both BOP and defendants. …The Commission also tweaked the Guidelines language – expanding in part and clarifying the commission's guidance on what might constitute extraordinary and compelling reasons warranting a reduction in sentence…
    ***
Importantly, the Commission retained the "other reasons" category, recognizing that it could not possibly identify the myriad extraordinary and compelling reasons that might warrant a sentence reduction.
The Commission considered but rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons. Rather, they need be *similar only in gravity.*

The Commission recognized that during the period between the enactment of the First Step Act in 2018 and this amendment, district courts around the country, based sentence reductions on dozens of reasons and combinations of reasons. Based on a careful review of those cases, the Commission continues to believe what is stated in Application Note 4 to the current policy statement, i.e., *that judges are 'in a unique position to determine whether the circumstances warrant a reduction.' Guidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts, rather than through an effort by the Commission to predict and specify in advance all of the grounds on which relief may be appropriate."* [emphasis in original]…

\*\*\*

…Then [Second Circuit] Chief Judge Jacobs….said… 'It is clear that Cromitie in his unmolested stated of grievance would… have continued to stew in his rage…indefinitely, and had no formed design about what to do. The government agent supplied a design and gave it form….

\*\*\*

[Cromitie] …does not invoke category 6 (unusually long sentence) but rather category 5, which allows the court to reduce a sentence for 'any other reason of similar gravity to the listed reasons.'… The Government's conduct *vis a vis* James Cromitie… was designed to result, and did result, in the imposition of a sentence that was both unjust and greater than necessary to redress any criminal behavior in which Cromitie engaged. …That qualifies as an extraordinary and compelling circumstances…" *Cromitie*, supra, at 1-2, 9, 12-13, 16, 21-22, emphasis supplied.

It is submitted that, as in *Cromitie*, it was quite unlikely that Mr. Alessa would have gone beyond simply making provocative statements had the undercover agent not pushed him to do something. Moreover, as in *Cromitie*, the government's conduct herein was designed to result in an overly harsh sentence – in this case via the application of the terrorism enhancement, rather than a mandatory minimum.

In *United States v. Hammoud*, 2022 US Dist. LEXIS 214184 (WDNC 2022), another terrorism case – which was *not* a sting operation, but a years-long conspiracy which provided a great deal of money to Hezbollah - where compassionate release was granted, the court stated:

"…From March, 1996 to July, 2000, Hammoud and ten others orchestrated a cigarette-trafficking scheme designed to support Hezbollah…
Hammoud was a leader in the organization…
Hammoud's conscious objective was to support Hezbollah…
…On resentencing in 2011, the Court granted a variance and imposed a 30-year sentence. … Hammoud has now been imprisoned over 22 years.

Hammoud identifies two 'extraordinary and compelling reasons' for relief: (1) a disparity between his sentence and other sentences for comparable conduct; 2) the disproportionality in his sentence caused by the application of the 'terrorism enhancement.'

…[T]he Court is persuaded that Hammoud has demonstrated 'extraordinary and compelling reasons.' First, Hammoud's 360-month sentence was 'sheer and unusual,' [quoting *United States v. McCoy*, 981 F.3d 271, 285 (4ᵗʰ Cir. 2020)] even after the substantial variance that the Court applied. *Hammoud had next to no criminal history. …* He committed nonviolent crimes. *And yet his sentence was significantly more punitive than the mean federal sentence for murder: 215 months for defendants with a criminal history of I…*

Hammoud's sentence was also grossly disparate compared to what courts now deem appropriate. …Hammoud was the first individual ever to be convicted at trial of violating the material support statute. …*Courts have since imposed more moderate penalties.* In fiscal year 2021, the average sentence for material support was 209 months. … Similarly, according to a survey of cases …offered by Hammoud, *the median sentence for individuals convicted at trial under the statute was 180 months*. …

***

*The specter of the terrorism enhancement, USSG 3A1.4, also loomed over Hammoud's sentencing.* That provision triggers dramatically-enhanced penalties at sentencing, catapulting a defendant's offense level by 12 points and ratcheting the criminal history level to the highest level, Category VI. *In Hammoud's case, the effect of the enhancement on his Guidelines sentence was extreme. His offense level jumped from 34 to 46, and his criminal history level went from the lowest (I) to the highest (VI). … As a result, his Guidelines sentence called for life imprisonment, instead of 151-188 months. Although the Court ultimately applied a variance, the Guidelines calculation – heavily weighted by the terrorism enhancement - undoubtedly influenced the sentence that Hammoud received. …*" *Hammoud,* supra, at 1-2, 4-10, emphasis supplied.

As in *Hammoud,* the effect of the terrorism enhancement herein was also extreme,

ratcheting the adjusted offense level from 29 – 42, and the criminal history level from the lowest

to the highest category. The Guidelines range went from 97-121 months to 360 months to life.

Were it not for this enhancement, which is not empirically validated[3], Mohamed Alessa would

have been released years ago.

**Other Terrorism Cases Where Compassionate Release was Granted**

In addition to *Cromitie, Williams,* and *Hammoud,* supra, there are several other terrorism

cases where compassionate release was granted. *United States v. Ali*, 2021 U.S. Dist. LEXIS

---

[3] See https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202308/88FR39907_public-comment_R.pdf#page=150, at 156-158

73320 (DMN 2021)( defendant convicted at trial of material support to Al-Shabab and still had many years left to serve); *United States v. Hassan*, 2020 U.S. Dist. LEXIS 165638 (DMN 2020) (defendant convicted at trial of material support to Al-Shabab); *United States v. Hassoun* 470 F. Supp.3d 804 (NDIL 2020) (compassionate release granted in a terrorism case to a young defendant who *served less than 10 years of his 23-year sentence* despite the defendant's facility having no confirmed COVID-19 cases at the time); *United States v. Hasanoff*, 2020 US Dist. LEXIS 199816 (SDNY 2020) (granting compassionate release based largely on family circumstances to a man who provided material support to Al Qaeda); *United States v. El-Hanafi*, 460 F. Supp.3d 502 (SDNY 2020) (granting compassionate release in a terrorism material support conspiracy case to a defendant who served around 10 years of his 15-year sentence); *United States v. Ferizi*, 1:16-cr-042 (EDVA 2020);  *United States v. Tajideen*, 1:17-cr-046 (DDC May, 2020) (granting compassionate release in a terrorism financing case to a defendant who served around three years of a five-year sentence); *United States v. Hossain*, 2020 WL 3265001, at *5 (N.D.N.Y. 2020); *United States v. Bary*, 2020 US Dist. LEXIS 18631 (SDNY 2020); *United States v. Rana*, 2020 US Dist. LEXIS 208638 (NDIL 2020.)

In *United States v. Hassoun*, supra, the defendant spent many months plotting with the informant, and then "placed what he thought was a bomb in a waste bin in Wrigleyville (a location close to Wrigley Field in Chicago, just after a concert there) with the intent to kill and injure hundreds of people and destabilize the city." *Hassoun*, at 805. He was released after having served about half of his 23 year sentence. While there were certainly mitigating circumstances (for example, it did not appear that Mr. Hassoun was motivated by ideology, but by the money offered to him, and by the sense of importance imparted to him by the government

agent) and while the main impetus for granting the motion was the COVID risk, it is still instructive, and the court stated:

> "…[T]he court is mindful that the defendant's criminal conduct, while extremely reprehensible, was encouraged by undercover law enforcement agents and never posed an actual threat to the public. …" *Hassoun*, supra, at 806

Mr. Alessa has now served nearly fourteen years of his twenty-two year sentence, and is due to be released in May, 2029, meaning that *he has served nearly 75% of his sentence at this point*, more than the 50% Mr. Hassoun served before release.

It is submitted that, as in *Cromitie* (and *Hassoun*), the problematic nature of the sting operation herein, and, as in *Hammoud,* the extremely harsh terrorism enhancement, combine to create an extraordinary and compelling reason for a sentence reduction which is "similar in gravity" to the reasons specified by the Sentencing Commission.

### More Recent Terrorism Cases with Significantly Lower Sentences

The *Hammoud* court pointed to the disparate nature of Mr. Hammoud's 30 year sentence compared to more recent sentences for material support cases, stating that the average sentence in those cases was 209 months as of 2021, or perhaps less, as defense counsel cited statistics stating that the median such sentence for those who *went to trial* was 180 months.

Undersigned counsel has also kept track of the sentences in terrorism-related cases, and has noticed a *pronounced downward trend in recent years*. While there are still a few very lengthy sentences, usually mostly for those who went to trial, there are also many much lower sentences.  See Appendix A, which lists 29 terrorism-related cases (24 of which are material support cases) where the defendants were sentenced to *84 months or less between 2019-2024*. Appendix A also lists another 60 terrorism-related cases (53 of which are material support cases) where the defendants were sentenced to 120 months or less.

Data (which can be provided upon request) shows that there were approximately 100 terrorism-related cases sentenced between 2019 and the first few months of 2024, the vast majority of which were material support cases. As noted above, there were 29 defendants who were sentenced to 84 months or less. The data also shows that in that same time period, there were 11 defendants sentenced to between 85-120 months; 19 defendants sentenced to between 121-180 months; 27 defendants sentenced to between 180-260 months; and 14 defendants sentenced to more than 260 months.

Thus only 14 of the 100 cases (*14 %*) (the vast majority of which were material support cases) sentenced between 2019 and the beginning of 2024 received a sentence as long as (or longer than) Mohamed Alessa. And of those 14 cases, 11 of them went to trial, meaning that *in recent years, only about 3% of defendants who pled guilty in these cases received sentences as long as Mr. Alessa's. This shows that, as in Hammoud, there is a substantial disparity between more recent sentences and the 264 months imposed in the instant case.*

### Rehabilitation, Young Age & Harsh Prison Conditions During Pandemic

In addition to the Family Circumstances and the effect of the terrorism enhancement/disparate sentence, there are three additional reasons which, in combination with the others, constitute extraordinary and compelling reasons for a sentencing reduction. Those are the extent to which Mohamed Alessa has been rehabilitated; his young age at the time of the offense; and the harsh prison conditions he has had to endure during the COVID-19 pandemic.

As discussed above, Mohamed Alessa's disciplinary record has improved greatly as he has matured and learned how to avoid any violent outbursts. Since 2015, he has had far fewer violations, and the few he had were minor. He recently completed an anger management class, which has also been helpful in giving him tools to properly deal with his emotions.

18

There are several cases where courts have recently found substantial rehabilitation, despite a significant number of disciplinary violations over the years. See, i.e. *United States v. Williams,* 2023 US Dist. LEXIS 129978 (SDNY 2023); *United States v. Cromitie,* supra; *United States v. Watts,* 2023 US Dist. LEXIS 1215 (EDNY 2023.) In *Williams*, the court stated:

> "…David Williams appears to have made strides in rehabilitating his life. I say this, even though his prison records also show that he was disciplined seven times … *most recently in 2022, when he was docked 27 days of good time credit for fighting with another inmate.* …
> But his prison records also show that Williams has earned his GED and successfully completed numerous educational courses…
> Rehabilitation alone cannot qualify as an extraordinary and compelling reason to grant a defendant's motion for compassionate release. … *However, a defendant's effort at rehabilitation tends to tip the scales in his favor when aggregated with more compelling grounds* – such as, in this case, the unduly harsh and unjust sentence."
> *Williams,* supra, at 35-36, emphasis supplied.

In *Watts*, the court similarly stated:

> "Mr. Watts' submissions indicate that he has made significant efforts at rehabilitation…
> The Court notes that Mr. Watts' two most recent infractions at BOP took place respectively *this year* and in 2018. … In the last 30 years, Mr. Watts' disciplinary record lists *24 infractions*, with two-thirds of the violations occurring before 2000. …Mr. Watts' documented conduct during the past 30 years of his incarceration *reflects an overall maturation and positive development,* and there is no evidence that Mr. Watts presents a current danger to the safety of others. …" *Watts*, at 35-36, emphasis supplied.

As in *Williams* and *Watts*, Mohamed Alessa has shown a great deal of improvement and maturity in recent years, and he has been discipline-free for about 18 months, longer than Mr. Williams and Watts had been when their cases were decided. As in *Williams*, he also obtained his GED and completed many educational courses. The Court should find that his significant rehabilitative efforts add to the weight of the other compelling reasons discussed herein, and support release.

In addition, Mohamed Alessa was only 17 at the time the Government argued the first overt act herein occurred (the 2007 trip to Jordan), 18 when he came home from Jordan, 19 when

the undercover officer entered his life, and 20 at the time of his arrest. There are many cases where courts have recently held that the defendant's young age at the time of the offense weighed on the side of granting a sentence reduction. See i.e. *United States v. Watts*, supra (the defendant was 20 at the time of the offense); *United States v. Kayarath*, 2024 US Dist. LEXIS 39674 (DKS 2024) (the defendant was 18 at the time of the offense); *United States v. King*, 2023 US Dist. LEXIS 196542 (NDCA 2023)(the defendant was 21 at the time of the offense); *United States v. LeBaron*, 2023 US Dist. LEXIS 199275 (SDTX 2023)( the defendant was *23* at the time of the offense.) In *Kayarath*, the court very recently stated:

> "Defendant asserts that his young age at the time of the offenses [18] and the long term he has now served constitute extraordinary and compelling reasons for a sentence reduction....
> …[T]he law has changed 'with respect to the law's recognition of the relationship between youth and culpability.' [*United States v. Mendez-Zamora*] 2022 US Dist. LEXIS 188630… Under current law, it is understood that 'young people are less mature, are more reckless and impulsive, are *more vulnerable to surrounding influences*, lack the ability to control their lives and surroundings, and have characters that are less fixed and *more amenable to change*…' *Id.* …
> ***
> …[T]he court finds that the following reasons collectively are of similar gravity to the circumstances presented in the first four categories of the police statement: (1) defendant received an unusually long sentence, (2) *his youth at the time of the offense*, (3) his criminal history was limited…, and (4) his significant rehabilitation…" *Kayarath*, at 8-10, 13, emphasis supplied.

It is submitted that this factor applies even more in this case than in many of the others, given the nature of the sting operation, and Mr. Alessa's susceptibility to the suggestions from the government agent.

Finally, many courts have found that the harsher than usual prison conditions during the pandemic also lend support to a sentence reduction. See, i.e. *United States v. Cromitie*, supra; *United States v. Williams*, supra. The *Cromitie* court stated:

> "…[T]he pandemic was extremely hard on prisoners. The necessary steps that the BOP took to stop the spread of a deadly virus – lockdowns, suspension of programs, and

curtailed visitation – led to increased prisoner isolation and fewer program opportunities for inmates. This created harsher than usual conditions of confinement, which is a factor a court can and does consider in deciding whether extraordinary and compelling reasons warrant granting compassionate release for a COVID-era inmate…" *Cromitie*, at 24-25.

## POINT II

### THE 18 USC 3553(a) FACTORS SUPPORT RELEASE

Consideration of the applicable factors from 18 U.S.C. § 3553(a), as also required by § 3582(c)(1)(A), leads to the conclusion that reduction at this time of Mr. Alessa's term of imprisonment to the time already served is warranted.

(a) The "nature and circumstances of the offense" and the "characteristics of the defendant." As discussed above, while the offense was very serious, there are mitigating factors, including young age and lack of criminal history. Moreover, Mohamed Alessa has had long-standing mental health challenges, and they were the chief reason he became involved in the instant offense, after falling under the sway of an older man who befriended him, but who was actually an undercover agent. This is not to say that Mohamed hadn't made some very problematic statements before that, and had even traveled to Jordan (where he had family) at the age of 17 in part to explore possibly becoming involved in something sinister. But he did not do that, returned home, and then the government initiated the instant sting operation. It is very likely that had that not occurred, he would never have actually gotten involved with any terrorist group.

In any event, Mr. Alessa is sorry that he ever was interested in joining Al Shabab or any similar group. He has matured significantly over the years, has shown great improvement in his disciplinary history, and has largely gotten a handle on the issues which led him to provoke people and act in an anti-social manner. He poses no risk to anyone at this time.

With regard to this factor, the *Hammoud* court stated:

21

"…The offense was undoubtedly very serious: Hammoud was a key leader in a scheme designed to support a foreign terrorist organization. …
Hammoud's history and characteristics militate in favor of a sentence reduction. *Hammoud's criminal history category was VI, but that was solely by the operation of USSG 3A1.4… In truth, Hammoud had virtually no criminal history…* He began trafficking cigarettes at *age 23, an age associated with increased impulsivity and law-breaking.* …" *Hammoud*, supra, at 11-12, emphasis supplied.

(c) The need to protect the public from further crimes is satisfied by the fact that Mr. Alessa does not pose a risk, and will be on supervised release in any event, where any needed mental health treatment can be provided. And if the court does have any concerns in that regard, home confinement could be imposed for a certain period of time.

Moreover, data collected by undersigned counsel shows essentially no recidivism for defendants convicted of terrorism-related cases (the vast majority of which are for material support), sentenced to over 5 years, and then released. See Exhibit "D," a table of 112 of those cases where the defendants were released after serving over 60 months. *Upon information and belief, none of the 112 have even been convicted of a new offense, let alone anything related to terrorism.* Undersigned counsel is only aware of one or two terrorism-related cases (out of well over a thousand, many of whom received very minor sentences after pleading guilty to minor offenses) where the defendant was even charged with new crimes after release. *This shows that the fear of recidivism in these cases – which led to the extremely harsh terrorism enhancement – has no empirical basis whatsoever.*

(d) Consideration of providing needed medical care in the most effective manner suggests release rather than continued incarceration.

(e) Given all the facts and circumstances discussed herein, a reduction in sentence is not inconsistent with the need to avoid unwarranted sentencing disparities. In fact, as shown above, and as discussed in *Hammoud*, supra, *there is a large unwarranted disparity between the 264*

*month sentence Mr. Alessa received, and more recent material support sentences,* where only about 14 % of the cases sentenced between 2019 and the beginning of 2024 received a sentence as long as (or longer than) Mohamed Alessa. And almost all of those went to trial, meaning that *in recent years, only about 3% of defendants who pled guilty in these cases received sentences as long as Mr. Alessa's.*

    (f) Finally, upon consideration of the overall statutory command that all sentences, while sufficient to achieve the objectives identified in subsection (a)(2), are not "greater than necessary," 18 U.S.C. § 3553(a), the sentence of imprisonment in this case should be reduced to time served for extraordinary and compelling reasons.

## CONCLUSION

For the foregoing reasons, this Court should reduce Mohamed Alessa's sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A.)

Dated: June 13, 2024

                        Respectfully submitted,

                        *Kathy Manley*
                        KATHY MANLEY
                        Attorney for *Mohamed Alessa*
                        NDNY Bar Roll No. 105730
                        26 Dinmore Road
                        Selkirk, NY 12158
                        (518) 635-4005 (phone and fax)
                        Mkathy1296@gmail.com